## M. MUSSON, Survivor, et al., vs. JOHN H. TRIGG et al.

1. HUSBAND AND WIFE: *Equitable estates.*

    If an estate is vested in a trustee in trust for the wife, such a conveyance creates in the wife an equitable estate, and confers upon her power to deal with it as a *feme sole.* Such estates can be rendered liable for the payment of debts by the separate act of the wife. They exist in trust and have grown up with equity jurisprudence, and are not recognized by courts of law.

2. SAME: *Power of married women over them.*

    The power of a married woman over her equitable estate is measured by the instrument creating the estate. The married woman's law of 1857 does not apply to such estates, and the class of contracts which that statute enables her to make is not the criterion of her capacity to bind her equitable estates.

3. SAME: *Married woman's law of* 1857.

    The statutes which secure separate estates to married women, do not interfere with, abolish or abridge the equitable estates which exist in trust and arise out of settlements by deed or devise.

4. *Case in judgment.*

    T. and Mrs. W., in contemplation of marriage, entered into an antenuptial contract, by which neither were to have any control or management, or intermeddle with the property of the other. Both owned large estates. In pursuance of this agreement, Mrs. W. conveyed to Abner Gaines, in trust, all of her property, upon the condition that she should "keep, use and enjoy the same to her sole and separate use, or to the use of such persons as she by writing or by last will may appoint." Mrs. T. then, after her marriage, paid a large debt for her husband. In consideration thereof, and to secure the same, T. conveyed upon like trusts to G., her trustee, a plantation. Afterwards, Mrs. T., in conducting her planting interests, became involved. She died, leaving a will which provided that all her just debts should first be paid, etc. A bill was filed to subject the property conveyed by T. to her trustee, to the payment of this debt. *Held*, that the conveyance of T. to G., in trust for Mrs. T., created in her a separate equitable estate in fee, completely under her control and subject to her disposal; that it was liable for her debts, and that her capacity to bind it was not dependent upon the married woman's law of 1857.

APPEAL from the Chancery Court of *Bolivar* County.

Hon. E. STAFFORD, Chancellor.

The facts in this case, necessary to a full understanding of the principles announced, are set out in the opinion of the court.

*Frank Johnston* and *Harris & George*, for appellants:

The statutes do not apply where the separate estate is held under a deed of settlement. Doty *v.* Mitchell, 9 S. & M., 435; Andrews *v.* Jones, 32 Miss., 274; Montgomery *v.* Bank, 10 S. & M., 566; Bank of Louisiana *v.* Williams, 46 Miss., 631. The wife's income appropriated by the husband made him her debtor; and generally as to the wife's right as a creditor, see 2 Kent, 164; 2 Vern., 689; S. C., 1 P. Williams, 266; 3 Paige, 614; 2 Atk., 384. Post nuptial conveyances from husband to wife are valid. 1 Johns. Ch., 538; 2 Kent, 174; 2 Story Eq. Jur., § 1372; 10 Vesey, Jun., 139; 7 Pick., 533; 8 Paige, 172; Clancy, 351. A conveyance directly to the wife from the husband, is upheld in equity. 2 Barb., 419; 1 Bish. on Mar. Women, § 717. Where there are no restrictions in the deed of settlement, the property passes absolutely, and she can hold it or dispose of it in any legal mode.

Clancy, 294, 296; Bish. on Mar. Women, §§ 851, 853; 2 Story Eq. Jur., § 1392, cases cited in note. In such cases she is regarded as a *feme sole* as to her separate property. 27 Miss., 343; 36 id., 558; 46 id., 633; Bish. on Mar. Women, § 853. Power to charge, on what principle based. 2 Story Eq., § 1397, notes 1 and 2; 1 Bish., §§ 855, 856, 870; 23 Mo., 45; 46 Miss., 618. There is no distinction between real and personal property. Bish., § 852; 23 Mo., 457, 547; 10 id., 758; 13 B. Mon., 381. Modern rule as to what debts are a charge. 2 Story, § 1400, and note 1; Bish., §§ 861, 862, 873. Opinion of the court in Murray *v.* Barlee, at length in 2 Story Eq., note 2, § 1400; 46 Miss., 418. Written engagements are a charge. 2 Story, § 1401, and note 3; 17 Vesey, 365; 15 id., 596; Bish., § 855; Whitesides *v.* Cannon, 23 Mo., 457; Bell & Terry *v.* Kellar, 13 B. Mon., 381; Segond *v.* Garland, 23 Mo., 547; Coats *v.* Robinson et al., 10 id., 758. Power to make a will. 3 Johns. Ch., 523; 2 Story Eq., 1390; 2 Kent, 171. Construction of will charges all the debts on separate estate. 2 Story Eq., § 1246; 18 Eng. Ch., 48; Jarman on Wills, 512, 519, 520, 521.

*W. L. Nugent*, for appellees:

The attempt in this cause is to subject the separate property of Mrs. Torrey to the payment of debts contracted, as alleged, " for goods, wares and merchandise, being plantation supplies," and evidenced by promissory notes, the security provided by the *feme covert* being the shipment of half her cotton crop for sale and application. The reason for the application is that she held said property under an antenuptial contract, and died testate, her will containing the usual stipulation: " I wish all my debts paid." The will in this cause has already been before this court, and it was sustained as a legitimate exercise of testamentary power under the antenuptial contract. The court say: " The power to make the will was derived solely from the antenuptial contract, and was limited by that agreement to the property in Arkansas and its proceeds. * * * The court of her domicile would have jurisdiction, by reason of the domicile, to give effect to the

will, as to the personal estate embraced in the deed of settlement, whereon it might be subsequently removed, and the proceeds of the real and personal estate embraced therein, wherever situate. * * * The probate, though general, would give effect to the will only so far as the testator had power, by virtue of the antenuptial contract, to dispose of the property mentioned in it." Cameron *v.* Watson, 40 Miss., 198. So that the *feme covert* did not possess the unrestricted power to make a will; in fact, the power is expressly denied by our statute then in force. Code, 1857, p. 432, art. 34. At the time of her marriage Mrs. Torrey was living in Arkansas, and her husband in Mississippi, and the settlement must have been made with reference to this state as the future domicile of the parties. Garnier *v.* Poydras, 13 La., 177; Kneeland *v.* Ensley, Meigs (Tenn.), 620; 2 Kent's Com., 11th ed., top p. 594, note b; id., 429. The parties were only solicitous to protect and preserve the Arkansas property; as to any property to be acquired in this state, it must have been contemplated that it should depend, for protection and enjoyment, upon the statute laws of the state. There is no exception in our laws as to antenuptial contracts, in reference to the conveyance of real estate by a *feme covert.* On the contrary, there is a denial of the right to convey in any way except that provided. Levy *v.* Darden, 38 Miss., 57; Work *v.* Glaskins, 33 id., 539.

The property in controversy was purchased with the proceeds of sale of the Arkansas property. The antenuptial contract gave Mrs. Torrey the right to sell it, and stipulated that she should "receive and dispose of the said proceeds for her own proper use." It was further provided that the moneys thus realized should not be liable to her husband's control, debts or disposal, but "shall remain wholly in the power and at the disposal of the wife, to use as she pleases during her life, and to dispose of at her death by last will and testament." The proceeds of sale were invested in the purchase of real estate in Bolivar county; but this property, under the provision of the settlement, could be used during Mrs. Torrey's life as she pleased, and disposed of at her death by last

will. That is to say, she had only a life estate in the property, and the power to appoint the remainder, if the settlement control it at all. If this be true, the corpus of the estate cannot be charged with the debts sued for. Prewett *v.* Land, 36 Miss., 495; 2 Story's Eq. Jur., § 1401, b. c.; Bradley *v.* Westcott, 13 Vesey, 445.

But the settlement did not contemplate or provide for a case of the sort indicated, in terms. In Grigby *v.* Cox, 1 Ves. Sr., 518, Lord Hardwick said: "In a case of this kind I will not go a jot further than I am obliged by the strictest rule that can be. \* \* This sort of transaction is generally contrary to the intent; for where a *feme covert* is to receive rents and profits to her separate use, the friends of the wife mean not that she will make a sale of it, but receive it from time to time." Keeping this rule in view, it is evident that the settlement was not intended to apply to cases where the rents, profits, or proceeds of sale of the Arkansas property were to be invested in the purchase of real estate in Mississippi. Our statutes afford ample protection in that behalf. This was a *cases onusses*, and the property can only be reached under our statutes, if at all. Block *v.* Cross, 36 Miss., 558; Newlin *v.* Freeman, 4 Ired. Eq., 312. If it contended that the deed from Torrey to Gaines, suitor, was a past nuptial settlement, valid and binding, I answer that the antenuptial settlement did not provide for the exigency, and the powers and capacity of the *feme covert* could not be so enlarged as to confer upon her the right to make a will denied by our statute, without some special provision to that effect, if at all. An examination of the account of Watts & Co., will show that the notes in suit represent the debts due that firm by Torrey & Gaines, trustees.

Aside from this, the notes of Mrs. Torrey are not, and cannot operate as a charge upon the *corpus* of the Bolivar county property. In Shattock *v.* Shattock, Law Rep., 2 Eq., Lord Romelly said: "The liability of a married woman's separate estate is only created by something which operates as a specific charge upon it, and the charge can only be produced by an intention on the part of the married woman to create it." "The modern doc-

trine," says Story, " is that there must appear an intention on her part to create such a charge upon her separate estate. &ast; &ast; &ast; It should appear that an engagement was made with reference to and upon the faith and credit of the estate. &ast; &ast; &ast; Something more is required to create a charge than the mere fact that debts are created by the married woman during coverture." 2 Story's Eq. Jur., §§ 1401, 1401 a, 1401 b. These views are ably sustained in 7 Paige, 112 ; 22 Wend., 528 ; 4 Sim., 82 ; 2 Sandf., 287 ; 18 N. Y., 265 ; 37 id., 528 ; 3 Ired. Eq., 236 ; 6 Yerger, 45. In Schlosser's Appeal, 58 Penn. St., 493, the court say : " The cases which permit married women to bind their separate estate, are exceptions to a general rule of sound policy, and should be strictly compressed within the limits prescribed." In Kimm v. Weippert, 46 Mo., 532, the most ably reasoned case I can find, it was distinctly held that a note made by a married woman, jointly with her husband, does not create a charge upon her separate estate, unless she has clearly manifested an intent to make her separate estate liable. The debt must be connected by agreement, express or implied, with the estate, or contracted for the benefit of the estate. The intention to charge must be stated in the contract itself, or the consideration must be one going to the direct benefit of the estate. Peake v. La Baw, 21 N. J. Eq., 269 ; Willard v. Eastham, 15 Gray (Mass.), 328 ; Wilson v. Cheshire, 1 M. C. Ch., 233 ; Yale v. Dederer, 22 N. Y., 450 ; White v. Story, 43 Barb., 124; Owen and Bellows v. Cawley, 36 id., 52 ; Todd v. Lee, 15 Wis., 365; Magwood v. Johnston, 1 Hill Ch. (So. Car.), 236 ; Sperling v. Rochfort, 8 Ves. Jr., 164.

Clearly there was, in this case, no expressed intention to charge the estate; the intention only related to the cotton crop upon the faith of which the notes were executed. The intention to charge the *corpus* of her estate could not be implied unless the consideration of the contract went to the direct benefit of the estate. In Magwood v. Johnston, *supra*, the court said : " In this enlightened age, some safeguards ought to be thrown around the right of disposition on the part of a *feme covert*, and the rule

that each case must stand on its own peculiar merits, seems to attain the ends of justice more nearly than any other which could be adopted." And if, as the lord chancellor, in Sperly v. Rochfort, *supra*, said: " Upon all the cases taken together in relation to the power of disposition by married women, it is utterly impossible to know the result." This court ought to affirm the decree of the chancellor in this case. Mrs. Torrey was rich when she married. In a very few years her Arkansas property was sold, the proceeds invested in real estate in Mississippi, and she died owning largely, over a quarter million dollars, as the appellants claim. She might well have intended that her cotton crops should go to pay the private debts of her husband and trustee, but could never have contemplated that her whole estate should be so applied.

SIMRALL, J., delivered the opinion of the court.

Mr. Musson, surviving partner of the commercial partnership of Jno. Watts & Co., prosecutes this suit against the administrator *de bonis non* with will annexed of the late Mrs. F. M. Torrey, deceased, and her heirs, and devisees, to collect a debt of $26,648.74.

At the time the debt was contracted Mrs. Torry was *feme covert*, the equitable owner of a large estate in Bolivar county, consisting of lands, slaves, stock, etc., devoted to the production of agricultural crops. In contemplation of marriage with G. G. Torrey, Mrs. Torrey, then Mrs. F. M. Walker, entered into an antenuptial contract, which recited that the marriage was thereafter shortly to be solemnized, and that Mrs. Walker was seized of a large estate, real, mixed and personal, in the state of Arkansas, and that Torrey was seized of a large estate in Mississippi; and that notwithstanding the marriage, they shall have no claim whatever, either in law or equity, the one upon the aforesaid separate estate of the other, or upon the rents, issues and profits thereof, but the same shall remain and continue, and be to them respectively and severally, or to such uses as they shall severally think fit and appoint. The indenture, then conveys to Abner Gaines,

trustee, all the property of Mrs. Walker, real and personal or mixed, whether legal or equitable, in possession or expectancy, upon the uses and trusts, that Gaines will permit Mrs. Walker " to keep and enjoy the same estate, with the rents, issues and profits, to her sole and separate use, or to the use of such persons as she, by writing, under her hand, or by last will and testament may appoint; and the said Torrey shall not intermeddle therewith, and that the same, or any part thereof shall not be liable to his control or disposal, but shall remain wholly in the power and at the disposal of Mrs. Walker; and upon the further trust, that Gaines will from time to time convey said estate or any part thereof to such person or persons as the said F. M. Walker, shall, by writing, under her hand, appoint, by an instrument in the nature of a last will and testament, and with full power on her part, should said estate, or any part thereof, be sold during her life, and appointed by her to be conveyed, to receive and dispose of, for her own use, the moneys arising from such sale or sales, and that the said moneys, the said Torrey shall not intermeddle with, and the same or any part thereof shall not be liable to his control, debts, or disposal, but shall remain wholly in the power and at the disposal of said F. M. Walker, to use as she pleases during life, and to dispose of, at her death by last will and testament, or an instrument of appointment in the nature thereof." Torrey covenants that he will permit his intended wife to use, enjoy and dispose of her estate, and the income, as expressed in the trusts, and Mrs. Walker's own contract, that in case of the marriage, and of her survivorship, she will make no claim to dower, or otherwise, in his estate. The marriage was solemnized sometime after this. In December, 1858, Mrs. Torrey advanced out of her own funds and paid to Fellows & Co., for her husband, $66,925.25, on his promise to repay, and in fulfillment of that promise, he did convey to Gaines, her trustee, 2,360 acres of land in Bolivar county, known as the Perthshire plantation. The deed declares that the conveyance is made for her sole and separate use, with power on her own said land, to dispose of the same, and the rents, issues and

profits, or the proceeds of the sale thereof, either by act of appointment under her hand, during her life, or an instrument in the nature of a last will and testament, as fully and amply to all intents and purposes, as she was authorized and empowered to dispose of her property held before her marriage, or by virtue of said marriage contract."

Mrs. Torrey made a last will and testament which was duly proved and admitted to record. By the first six clauses thereof, various legacies are given. The seventh is to this effect : " Before the distribution of the above named property, I instruct my trustee to keep together, and manage all my property until all my just debts are paid, and then to transfer the above legacies to the legatees respectively, or their duly authorized agents or representatives." The eighth clause directs, after payment of just debts, a sale of certain property in Arkansas and Mississippi, and the distribution of the proceeds among certain persons named. The same direction is given as to after acquired property. Tibbills was appointed to execute the will as her "friend and trustee." The record is very voluminous, chiefly on account of the length of the pleadings and exhibits thereto. Numerous suits were pending at law by the creditors against the personal representative of Mrs. Torrey. These were suspended, and the parties were allowed to come in and exhibit their debts in this suit. It will be perceived that the object sought by the complainant was to charge his debt upon Mrs. Torrey's equitable estate in Bolivar county, being the property conveyed by Torrey to Gaines, trustee. It is alleged in the bill that the slaves have been emancipated, and most of the personal effects destroyed, so that but little more remains than the "Perthshire" plantation. The defendants demurred to the bill, which was overruled. In their answer they insist that the debt is not obligatory upon Mrs. Torrey, nor ought it to be a charge on her property, because it was not contracted for any of the purposes, nor upon any of the considerations named in the married woman's law of 1857 ; and, secondly, if that statute does not apply, then they aver that the debt was not incurred for

the benefit of Mrs. Torrey, and that the writing relied upon by the complainant as imposing a charge on her estate was procured by the duress and compulsion of her husband, and therefore, according to the principles prevailing in courts of equity, the debt does not bind her equitable estate.    The writing referred to is a letter dated December 18, 1860, and addressed to " Jno. Watts & Co.," and is to this effect : " Inasmuch as I am indebted to your firm in the sum of $26,648.74, which sum is for plantation supplies and money by you heretofore advanced to me for the conducting and carrying on my separate estate and interest, I hereby propose to liquidate said debt as follows, viz. : to give you of this date, my four promissory notes drawn jointly with G. G. Torrey, my husband as follows : [Then follows a statement of the notes falling due in 1861 and 1862, in the whole amounting to $26,648.74], " and I hereby bind myself to deliver to you for sale on my account (the nett proceeds to go to the extinguishment of my said debt as above) stated, at least one-half my crop of cotton, to be made in the year 1861   *   *   *   and so on from year to year until final payment, etc.          (Signed)     F. M. TORREY."

" I approve the above.          (Signed)     G. G. TORREY."

The first and important question is, whether Mrs. Torrey's liability to her creditors is to be determined under the statute of 1857, or under the unwritten law as administered in courts of equity in reference to the equitable estates of married women, and their power over it.    If under the former, the debt must be of one of the classes enumerated in the statute.    If the property sought to be charged is held under the statute, then she has only a limited power over it.    She is, in effect, *discovert* so far as the statute enables her to contract; but subject to disability beyond that.    The most prominent policy promoted by the statute, and similar ones in the other states, was to abolish the common law property relations established by marriage, so that the wife's personal effects and choses in action should not become the property of the husband, but continue her property, and the income as well as the seizure of her real estate, should remain her own, notwith-

standing the coverture, she continued the legal owner of every species of property, with the exclusive right to the receipt and enjoyment of its income. By the same right and tenure, she held after acquired property. Marriage did not divest her title to personalty and vest it in the husband, nor did it impart any title to her freehold estates, or right to the income. But whilst the right and the revenues remained to the wife, the *jus disponendi* as to the realty was limited to a particular mode, and the liability of her property, of whatever kind, to the payment of her personal engagements, was also restricted to certain enumerated classes, determinable by the purposes for which they were incurred, and not by the instrument or form of the obligation. Within the range of the statute her engagements were legal obligations enforceable in courts of law. Whitworth *v.* Carter, 43 Miss., 61 ; Foxworth *v.* Magee, 44 id., 430; Harding *v.* Cobb, 47 id., 602; Garrett *v.* Dabney, 27 id., 343.

The statute, to a large degree, abrogated the rights which the marriage conferred upon the husband at the common law, and retained to the wife the title, with a limited right of subjecting her property to her personal contracts. As compensation to the husband, he was released from the duty of paying her antenuptial debts. The paramount and controlling motive of the statute was to retain to the married woman what she had at the marriage or might afterwards acquire, notwithstanding the coverture, so that it did not become in any wise the property of the husband, subject either to his control or his debts. But whilst the statute declared that these property relations should attach on marriage, it left all who contemplated marriage, and their family or friends, free to create such interests in property by settlements as prudence and the exigencies of each particular case might require ; so, too, testators were free to devise property on such terms of enjoyment, on such uses and trusts, as their inclination or judgment might dictate. The *jus disponendi*, which is incident to ownership, may be executed to create such trusts and uses in property as the donor may choose to bestow upon the beneficiary. These statutes, which secure to

married women separate estates, do not interfere with, nor were they intended to abolish, or abridge, or interfere with these equitable estates, which exist in trust and arise out of settlements on *feme covert*, by deed or devise. If an estate is vested in a trustee in contemplation of marriage, upon trusts for the wife, or if the estate is thus settled after marriage, it is plain that the grantor meant that the *feme covert* should enjoy and dispose of the equitable estate in accordance with the rules and principles which courts of equity apply to such estates. The very fact of making such a settlement conclusively manifests the intention that the *feme covert* shall not hold the property subject to the limitations and restrictions of the statute, but with such rights and privileges as belong to it, according to the principles of courts of equity. The statute is not prohibitory. It does not forbid the creation of equitable estates in married women by deed or devise. It becomes the law of the tenure and the measure of power to charge and dispose of the estate where the *feme covert* is legal owner at the time of the marriage, or acquires it by that title subsequently. But if her interest in the estate is equitable, with the legal title outstanding in another for her use — her rights are derived from the instrument creating the estate — are measured by that, and not by the statutes. One is an estate existing in trust, which has grown up with equity jurisprudence without recognition in courts of law, depending exclusively for life and protection upon the courts, which administers that department of jurisprudence out of which it was born. Courts of law ignore it altogether. The other is a statutory legal estate, the product of modern legislation. They are independent and altogether different estates. They pursue parallel but separate lines, and refer to different systems of jurisprudence for the rules and principles which pertain to and characterize them. Observing upon the distinguishing features of these estates, in Hackett & Callaghan *v.* Metcalfe, 6 Bush (Ky.), 355, the court says, speaking of an equitable estate in the married woman by deed: "A separate estate thus created confers on a married woman the power to deal with it as a *feme sole*. The right she ac-

quires to property under the operation of the statute to protect
the right of married women confers on her no such power.     The
two estates are essentially different; one of them can be rendered
liable for the payment of debts by the separate act of the wife, the
other only in the mode pointed out by the statute." Johnston et
ux v. Jones, 12 B. Mon., 329; Lillard v. Turner, 16 id., 374.     The
separate estate which a married woman holds and controls under
the statute is subjected to her debts, because she has legal capacity
to contract them, and the aid of a court of equity is not needed to
enforce them.     The distinction of the two estates is fully recog-
nized in Devries v. Conklin, 22 Mich., 259; so does Richardson v.
Stodder, 100 Mass., 528; Garrett v. Dabney, 27 Miss., 343–4–5.

We conclude, therefore, that the married woman's statute of
1857 does not apply to equitable estates held by married women,
under settlements by deed, or devise, and that the class of con-
tracts which she is enabled to make by the statute is not the cri-
terion of her capacity to bind her equitable estate — but we must
consult for the rule on that subject, the principles which have
been from time to time developed and adopted as part of the
equity system of trusts.     We must accept for our guide and au-
thority the unwritten Law of Equity Jurisprudence, and not the
statute.     It may be observed that Mrs. Torrey held the Bolivar
county plantation, and other property conveyed by Torrey to
Gaines, trustee, with the same measure of right as expressed in
the antenuptial settlement.     That settlement placed the use and
enjoyment of the property and its income to " her sole and sepa-
rate use," or to such persons as she may appoint under "her
hand," or by " last will,"    *    *    "and the said Torrey shall not
meddle therewith, and the same or any part thereof shall not be
liable to his (Torrey's) control or disposal, but shall remain wholly
in the power and at the disposal of Mrs. Walker." She took an
absolute, unrestricted, equitable estate in fee, subject to her ex-
clusive control and disposition.     How far then is such an estate
liable for the debts of Mrs. Torrey?     The prominent idea per-
vading the marriage settlement is, that each party shall retain

and keep his or her property as separate estates, not to be affected by the marriage, and so completely so, that in case of survivorship Mrs. Torrey surrendered and abandoned all claim to dower or otherwise in his estate.    These estates consisted of agricultural property employed in the production of cotton for market. Whether Torrey had other property besides the "Perthshire plantation" conveyed to the trustee, does not appear.    It is shown that the indebtedness of Mrs. Torrey grew out of dealings between her trustee and herself, as to controlling that sort of property, and John Watts & Co., cotton factors and commission merchants.    It is the common case of a planter, in debt to a commission merchant and factor, at the beginning of the war, with the means and ability to pay swept away at the close.    The only way by which income and profit could be realized by her, as contemplated by the settlement, was in the production and sale of cotton crops.    This necessitated the relations between herself and some person, as a factor, with the usual dealings between such parties. Between parties dealing in this relation with each other, it is plain that it was meant and understood, that for whatever balance might be due the factor, the property of the married woman must be looked to for payment.    John Watts & Co. dealt with Mrs. Torrey, as the absolute owner of the equitable estate in fee, completely under "her control and subject to her disposal."    The *jus disponendi* remained to her, as if she were unmarried.    She could have sold the estate, and her trustee would have been obliged to convey to her appointee; the money which she might have derived from it would have been exclusively hers.    The character of her transactions with John Watts & Co. was such as was common and usual with all persons owning the same sort of property, and it is just to suppose that she intended to pay whatever debt she incurred in the course of the dealings out of the property, and that the complainants extended credit on the faith of it.    But the letter, above quoted, puts at rest all doubt on that point.    That clearly indicates that she held herself responsible for the debt, and engaged to pay it.    The stipulation to pay

out of her crops of cotton, points to her income as the source from whence payment was to be made. But in view of the changed condition, wrought by the war, it became impracticable to make crops, as intended at the time. We think, under the circumstances, the complainant's debt ought to be paid out of the property mentioned in the pleadings, and that is enough to dispose of the case.

Counsel have presented most able and elaborate arguments, rich in learning, on the general subject of the power and capacity of the *feme covert*, to impose the burden of debt on her separate equitable estate. But it is not necessary for the decision of this case to go into that subject. The decisions of this state, it may be remarked, are not harmonious on that subject.

Decree reversed, and cause remanded.